IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

RAYMOND A. FORD, JR.,           )
      Plaintiff,             )      Civil Action No. 7:22-cv-00122
                           )
v.                         )
                           )      By: Elizabeth Dillon
RALPH NORTHAM, *et al.*,        )        United States District Judge
      Defendants.       )

## MEMORANDUM OPINION

Plaintiff Raymond A. Ford, Jr., a prisoner in the custody of the Virginia Department of Corrections ("VDOC") and proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983. He paid the full filing fee. His complaint names ten defendants: the former and current governors of Virginia (Ralph Northam and Glen Youngkin, respectively), VDOC's Director Harold Clarke, Kemsy Bowles (the Warden of Coffeewood Correctional Center ("CWCC")), Regional Ombudsman S. Moe-Willis, and five defendants who work at CWCC, where Ford was housed at all relevant times: Kimberly Souter, S. Ruiz, C. Walker, Ashlyn Hartsook (sometimes spelled in defendants' filing as Hartsbrook or Hartsock), and Nick Meyers.[1]

Ford's complaint is lengthy, consisting of 115 hand-written pages. ( *See generally* Dkt. No. 1.) In an introduction, Ford alleges "infringement upon, violation, and denial of various rights protected by the United States and Virginia Constitutions, and Religious Land Use and Institutionalized Persons Act (RLUIPA), the Americans with Disabilities ACT (ADA), and the

---

[1] The style of the complaint also includes the language "all employees at CWCC." (Compl. 1, Dkt. No. 1.) Defendants' counsel interpreted that as referring to a separate defendant and declined to accept service on behalf of that defendant. But the court interprets those words as a reference to where other named defendants are employed, and not as a separate defendant. (*See also* Compl. 3 (describing parties).) Regardless, to the extent Ford intended to sue "all employees at CWCC," that entity is not a proper party to a § 1983 action. *See Wells v. S.C.D.F. Emps.*, No. CA 2:10-3111-CMC-BHH, 2011 WL 2472512, at *2 (D.S.C. May 19, 2011) (collecting authority for the proposition that group defendants such as "medical staff" are not proper defendants under § 1983), *report and recommendation adopted,* No. CA 2:10-3111-CMC-BHH, 2011 WL 2463066 (D.S.C. June 21, 2011)

Health Insurance Portability and Accountability Act (HIPAA)." (*Id.* at 7.)[2] His complaint also includes other claims, as discussed herein.

Most of Ford's claims are based on his overarching theory that the mitigation measures used by the governor and VDOC officials to control the spread of COVID-19, and particularly their making vaccines available to inmates and providing incentives to inmates to accept the vaccines, were harmful to him and other inmates.[3] He states that the "new normal" implemented by VDOC after the vaccine became available violated his constitutional rights by requiring that he be

> "fully" "vaccinated" with a COVID-19 "vaccine," which, according to Plaintiff, is a publicly-funded biological weapon of mass destruction (WMD or BWMD) that actually causes COVID-19 and promotes mutations of COVID-19.

(Compl. 7.)

Ford further asserts that he has "numerous reasons for objecting" to the vaccine and does not want it. (*Id.*) These include that he contracted COVID-19 in late 2020, and he has "natural immunity," as well as his concerns about the vaccine's safety and effectiveness. He suggests that "by mandating and infecting Plaintiff, other VDOC prisoners and staff with this BWMD, defendants are engaged in a practice of genocide, as well as state-sponsored Munchausen Syndrome by proxy" because extensive use of vaccines is prolonging COVID infections and sickness. (*Id.* at 8.) Relatedly, he contends that when the vaccine was released, the VDOC policies implementing the "new normal" were "acts of both [s]ecession and treason." (*Id.*)

---

[2] Citations to pages of the complaint are to the numbers assigned by the court's Case Management/Electronic Case Filing System, not to the handwritten page numbers on the bottom of each page.

[3] Although Ford also alleges that defendants encouraged widespread vaccination because they had a financial stake in the sale of vaccines (Compl. 87–88), he has presented no facts based on personal knowledge to support any such claim. Indeed, he even notes that he simply "suspects" that their conduct stems from a conspiracy to profit from the pandemic and from vaccines. (*Id.* at 87.) Thus, the court cannot credit those conclusory allegations of a wide-spread conspiracy or of any defendant's "hand" being in the "cookie jar," as Ford repeatedly alleges. (*See, e.g., id.*)

Pending before the court is a joint motion to dismiss filed by all defendants (Dkt. No. 17), to which Ford has responded (Dkt. No. 24).  The motion seeks dismissal of all claims against all defendants on various grounds.  Ford also has filed a motion to expand the record.  For the reasons set forth herein, the court will grant defendants' motion to dismiss, although it will grant Ford leave to amend—should he choose to do so—in order to provide further factual detail in support of one of his retaliation claims and his access-to-courts claim.  The court will deny as moot Ford's motion to expand the record.

I.   BACKGROUND

## A. Factual Background[4]

After setting forth his basic theory of the case in the complaint's "introduction," Ford devotes many pages to explaining what a coronavirus is, why both COVID-19 and its vaccines are WMDs or BWMDs, setting forth a history of the pandemic and the U.S. response to it, including an alleged "cover-up" related to the release of the COVID-19 virus in China, explaining various parts of the vaccine, and describing how and why it has been "weaponized." (*Id.* at 10–41.)  He also includes a section explaining the history of U.S. "Munchausen Syndrome by Proxy" and how the vaccines represent "state-sponsored Munchausen Syndrome by Proxy." (*Id.* at 41–46.)  He then discusses why he believes natural immunity is superior in strength to the vaccines, the "questionable" efficacy of COVID vaccines, how the booster shots affect antibody levels, and how the vaccines are contributing to the infection rate.  (*Id.* at 47–53.)

Finally, beginning on page 54 of his complaint, Ford begins to discuss COVID-19-related events that occurred within VDOC or at CWCC.  He explains that that he had worked at the law library at CWCC since 2018, and he had worked hard to ensure that the law library remained a

---

[4]  The court sets forth many allegations from Ford's complaint here, but additional factual allegations are discussed in context in addressing his legal claims.

3

"COVID-free zone."  (*Id.* at 54.)

In "late 2020," VDOC and CWCC officials "offered—with incentive for the first time—a 'flu shot.'"  (*Id.* at 55.)  After other prisoners received this shot, and staff and prisoners mingled, Ford became infected with COVID-19.  After his recovery, Ford was told by several doctors that he had "natural immunity to COVID-19," and he then conducted " an extensive research project" as to natural immunity.  (*Id.*)  From then until the filing of his complaint in March 2022, Ford did not test positive again for COVID, although "nearly all vaccinated prisoners around him have tested positive."  (*Id.*)

In December 2020, VDOC distributed a fact sheet about the COVID vaccine being made available to VDOC prisoners, and many prisoners agreed to be vaccinated, but Ford refused.  In early 2021, defendant Hartsook became CWCC's new Institutional Program Manager.  Ford alleges that she began implementing directives to implement a "new normal," which were passed down from Governor Northam, VDOC Director Clarke, Dr. Anthony Fauci, the CDC, the Virginia Department of Health, and others.  (*Id.* at 58.)  The "new normal," which would begin in mid-July 2021, would allow persons who had been fully vaccinated to attend programs, school, the law library, or any other services offered at CWCC, if they lived in a dorm in which 75% of the people were vaccinated, although the requirement did not apply to "re-entry programs" run by the state.  (*Id.*)

Ford raised his concerns over the "new normal" policies to numerous people.  He explained to Hartsook and others, and subsequently in numerous informal complaints and grievances, that vaccinated and unvaccinated prisoners live together at CWCC in dorm-style rooms, share restrooms and other equipment, and are moved between buildings and even prisons, and that half of the CWCC staff was not vaccinated.  In light of these facts, the "new normal" principles made "no sense."  (*Id.* at 59.)  He further explained that the principles were "untimely"

because Virginia's state of emergency ended on June 30, 2021, that denying unvaccinated prisoners access to programs was discriminatory, punitive, and a violation of constitutional protections, and that because he and "everyone" at CWCC already had COVID, they all had natural immunity, so the vaccinations were unnecessary.  (*Id.*)  Moreover, Ford conveyed that no physician or other medical staff had ever recommended that he get a COVID vaccine.  (*Id.*)

Nonetheless, because he refused to receive the COVID vaccine, he began to be denied access to the law library, religious services, and programs.  (*Id.* at 61.)  According to Ford, other "new normal" measures included a decrease in law library hours, the library being closed at night, a reduction in religious programs from twice weekly to once monthly, educational and vocational programs being cut down, and visitation being decreased.[5]  (*Id.* at 62–63.)

He also complains that defendants were still enforcing policies and procedures, at the time of the complaint, that make it more likely that COVID will spread, including refusing to turn on the ventilation system, refusing to give more than 50 minutes of fresh air or outdoor recreation daily, and insisting that prisoners wear masks in certain circumstances.  (*Id.* at 83, 85–86.)

As noted, Ford filed numerous complaints and grievances about the "new normal" policies and his other claims raised in this lawsuit.  He claims that although all of his grievances were timely, some were improperly denied as untimely and all were ultimately rejected, despite their merit.  (*See Id.* at 5, 63–83.)  He also alleges that, apparently as a result of both his refusal to be vaccinated and his filing of grievances and complaints, defendants have retaliated against him.

---

[5] Although Ford's complaint is not clear, it appears that when discussing decreases in activities,  he is comparing the "new normal" with activities that were permitted prior to VDOC's COVID-19-related lockdowns. (*Cf.* Compl. 111 (seeking injunctive relief including a return to "normal operations as before the lockdown, state-of-emergency, and 'new normal'").)

**B.  Ford's Claims**

Ford's complaint lists sixteen claims, which are summarized as follows:

**Claim 1**: Defendants' mandates and attempts to compel his infection by encouraging him to be vaccinated violate the 5th, 8th, and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;[6]

**Claim 2**: Defendants' mandates and attempts to vaccinate Ford will subject him to irreparable harm in violation of the 9th and 10th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

**Claim 3**: Defendants' actions in punishing Ford and blocking him from religious services, the law library, visitation, etc. violate the 1st, 5th, 8th and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

**Claim 4**: Defendants' actions in allowing both vaccinated and unvaccinated prisoners housed in re-entry programs to attend religious services together, while prohibiting Ford from attending his religious services, violate the 1st, 5th, 8th, 9th, 10th, and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;[7]

**Claim 5**: Defendants' implementation of the "new normal" is the effective suspension of the laws and Constitutions of the U.S. and Virginia and violates the 9th, 10th, and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

**Claim 6**: Ford's conviction and sentence were in violation of Due Process and therefore his continued incarceration violates the 1st, 5th, 13th, and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

**Claim 7**: Defendants' actions in disregarding and blocking Ford's grievances violate the 1st, 5th, 6th, 8th and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

---

[6] Many of Ford's claims reference multiple—and different—sections of Article I of the Virginia Constitution.  The court does not list the specific sections referenced in each claim here.

[7] Part of this claim seems to be an establishment clause claim, but it is based on other prisoners (housed in re-entry programs, unlike him) being "compelled" to attend certain programs, which Ford characterizes as religious. Ford does not have standing to pursue such a claim.

**Claim 8**: Defendants' actions violate the Ku Klux Klan Act of 1871;

**Claim 9**: Defendants' actions in denying Ford access to religious programming violate RLUIPA;

**Claim 10**: Defendants' actions of implementing the "new normal" constitute treason and a secession from the United States, and those actions violate the 1st, 5th, 6th, 8th, and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

**Claim 11**: Defendants' actions in establishing a system of tracking Ford's vaccination status and releasing such information violate HIPAA;

**Claim 12**: Defendants are liable for defamation, slander, and libel by spreading rumors that Ford was a contagious health hazard;

**Claim 13**: Defendants' actions in keeping the ventilation system off and restricting access to outside air despite a highly contagious virus circulating violate the 5th, 8th and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution;

**Claim 14:** Defendants are able to profit from the vaccine mandates, which is a conflict of interest and violates Article I of the Virginia Constitution;

**Claim 15:** Defendants' actions in retaliating against Ford for complaining for all of the above violate the 1st, 4th, 5th, 6th, 8th, and 14th Amendments of the U.S. Constitution and Article I of the Virginia Constitution; and

**Claim 16**:  Defendants' actions in denying Ford access to religious services, work, visitation, and the law library violate the Americans with Disabilities Act (ADA), 42 U.S.C. .§ 12101 *et seq*., and Section 504 of the Rehabilitation Act.

(Compl. 83–99 (setting forth claims with subparts); *see also* Defs.' Mem. Supp. Mot. Dismiss 2–4, Dkt. No. 18 (containing nearly identical summary).)  Ford does not dispute this characterization of his claims in his response.  (*See generally* Dkt. No. 24.)

For relief, Ford asks for compensatory and punitive damages, various declaratory judgments, and injunctive relief.  The injunctive relief includes requests that defendants be ordered to immediately discontinue and rescind the "new normal" policy, to stop keeping track of who is vaccinated and who is not, to restore Ford with all rights and privileges as those who

are vaccinated, and to allow Ford to attend his religious services and have adequate access to the courts.  (Compl. 105–115.)

## C.  Parties' Arguments

Defendants argue that Ford's motion to dismiss is subject to dismissal both because he fails to allege adequate personal involvement by the defendants, so as to render any of them liable under § 1983, and because his claims fail to state a claim for which relief can be granted. Other arguments include that defendants are immune from damages for official-capacity claims. (*See generally* Mem. Supp. Mot. Dismiss, Dkt. No. 18.)

Ford's 85-page response to the motion to dismiss and its attachments fill a medium-sized box.  (Pl.'s Resp. to Mot. Dismiss, Dkt. No. 24.)  His filing includes twenty-eight separate affidavits from him, all of which attach numerous articles, information from websites, or other documentation in support of the background information in his complaint, his attempts at exhaustion, or his claims.[8]  It also includes a 24-page "summary" of those affidavits and the supporting evidence.  (Dkt. No. 24-1.)  Moreover, a big chunk of the response itself is dedicated to a discussion of his affidavits and information from the attachments.  (*See* Pl.'s Resp. 3–43.)

---

[8]  The affidavits reference the following topics: (1) COVID-19: a publicly-funded weapon of  mass destruction used against the people of the United States; (2) Racial justice protests, white Nationalist militias, war on police and the CHOP, domestic terrorism and the police betrayal, Jan. 6th: the storming of the Capitol; (3) President Donald Trump's downplaying of COVID-19 dangers; (4) Operation Warp Speed, AKA Manhattan Project 2; (5) The use of COVID-19 spike proteins to make COVID-19 vaccines; (6) Variants of SARS-COV-2; (7) The intentional spread of COVID-19 through vaccinations; (8) Continuous risky research using gain-of-function and gene therapy which caused pandemic; (9) Vax-producers' admissions that COVID-19 vaccines were rushed, are extremely unstable, unverified, and will be used to change DNA; (10) Failed HIV/AIDS vaccines which is the basis of COVID-19 vaccines; (11) Those objecting to experimental vaccinations and eugenics-style practices; (12) The abomination of vaccine research and development; (13) Risks of vaccination; (14) Deaths after vaccination; (15) State-sponsored Munchausen Syndrome by Proxy; (16) Elimination of masks and social distancing for the vaccinated; (17) Spread of Delta variant of COVID-19 among the vaccinated; (18) Rise of COVID-19 after campaigns of vaccinations and boosters; (19) Two levels of immunity: internal and mucosal immunity; (20) Natural immunity; (21) Natural immunity 2; (22) Improper assessment for the need of booster shots; (23) Omicron variant; (24) His sincerely-held religious beliefs and genetic and medical issues exempting him from COVID-19 vaccinations; (25) Relevant laws, codes, rules, policies, procedures, etc.; (26) Complaints, grievances, and meetings with VDOC officials, Part 1; (27) Complaints, grievances, and meetings with VDOC officials, Part 2; and (28) Complaints, grievances, and meetings with VDOC officials, Part 3.

The heart of Ford's response to defendants' arguments is contained on pages 44 through 81.  The first portion of that responds to defendants' arguments of immunity and lack of personal involvement.  (Pl's Resp. 44–60.)  As to these arguments, Ford counters that they are "premature, unsupported by affidavit, unbelievable, and must fail for these and many other reasons."  (*Id.* at 44.)  Ford then turns to the defendants' arguments regarding his failure to state a claim.  (*Id.* at 60–81.)  His response to these arguments will be discussed in the context of discussing specific claims.  *See* Section II-D *infra*.

## II.  DISCUSSION

### A.  Motion to Dismiss[9]

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).[10]  To withstand a Rule 12(b)(6) motion, a pleading must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.  In considering the motion, the court must accept well-pleaded allegations as true and must construe reasonable inferences "in the light most favorable to the nonmoving party."  *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).  A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments."  *Giarratano*, 521 F.3d at 302.  *Pro se* complaints are afforded a liberal construction.  *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006).

---

[9]  The court is dismissing in this opinion some claims that defendants neglected to address in their motion to dismiss or on different grounds than those they raised.  To the extent the court's dismissal of any claim is considered a sua sponte dismissal, the dismissal is pursuant to 28 U.S.C. § 1915A(b) and 42 U.S.C. 1997e(c).

[10]  Unless otherwise noted, the court omits internal citations, alterations, and quotation marks throughout this opinion.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

**B. Generally**

Before turning to defendants' specific arguments, the court addresses some general

aspects of Ford's response and arguments.  First of all—and despite the obvious effort that Ford

has put forth into researching and collecting articles and information to support his general

positions regarding COVID-19 and its vaccines—it is well established that a plaintiff may not

amend his complaint through briefing.  *See S. Walk at Broadlands Homeowner's Ass'n v.*

*OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013).  It is both inappropriate

and unnecessary for the court to consider his affidavits to determine whether his current

complaint states a claim, so the court has not considered them.[11]

Second, Ford often notes all of the allegations that defendants do not "deny."  For

example, he states that defendants do not deny that they "orchestrated a campaign of mandates,

punishments, retaliations, reprisals, obstructions, marginalizations, discrimination, etc. to force

injection of the BWMD 'vaccines' under threat, duress, and coercion . . ."  (Pl.'s Resp. 40–41.)

Similarly, he asserts that defendants "admit" that they are acting outside of their capacity as

medical advisors, by encouraging inmates to receive the vaccine, and that they are not medical

doctors and should not be doing so.  (*Id.* at 69.)

These arguments about denials and admissions are misplaced.  No "denial" is required in

bringing a motion to dismiss.  Instead, a court ruling on the motion to dismiss must assume the

truth of the well-pleaded factual allegations of the complaint.  *Massey*, 759 F.3d at 347.  Thus,

defendants' failure to "deny" anything in their motion to dismiss is meaningless.  Likewise,

treating facts set forth as "true" for purposes of a motion to dismiss does not constitute an

---

[11]  To the extent Ford's affidavits include facts relevant to any of the claims that the court is dismissing without prejudice and allowing him to refile, Ford may include such facts in any amended complaint that he chooses to file.  The court notes, however, that based on the topics of his affidavits, at least the first twenty-three affidavits with attachments are wholly irrelevant to any of the claims the court is allowing in any amended complaint.

10

admission.  *See Crumb v. McDonald's Corp.*,  No. CV DKC 15-1719, 2016 WL 6822481, at *1 (D. Md. Nov. 18, 2016) (noting same).

Third, some of Ford's arguments or statements—like the one quoted two paragraphs ago—misstate the *facts* laid out in Ford's complaint, relying instead on his conclusions.  In that quote, Ford suggests that he or others were "forced" to receive vaccines.  But his own allegations make clear that he has refused the vaccine and no one has forced him to receive it.  Thus, any arguments based on alleged "forced" medication are untenable.

Fourth, throughout his response, Ford complains that defendants have failed to provide affidavits to support their assertions.  This argument, however, misconstrues the purpose of a motion to dismiss, which is to test the complaint's factual and legal validity; it is not to develop or provide a record based on testimony and other evidence.  *Compare* Fed. R. Civ. P. 12(b)(6) *with* Fed. R. Civ. P. 56.

Fifth and finally, Ford argues that defendants' motion to dismiss is precluded because the court did not sua sponte dismiss his case under 28 U.S.C. § 1915A, and it thus has implicitly ruled that his claims adequately state a claim.  (Pl.'s Resp. 43, 74–75.)  Ford is incorrect, however.  As other courts have recognized, "a court's decision allowing some claims to go forward at the initial screening stage does not insulate those claims from later review on a motion to dismiss."  *Hendrix v. Pactiv LLC*, 448 F. Supp. 3d 43, 50–51 (W.D.N.Y. 2020).  *See also Mendez v. FMC Facility Section*, No. 19-CV-2820 (NEB/TNL), 2021 WL 4044911, at *3 (D. Minn. Apr. 30, 2021) (collecting authority for same), *report and recommendation adopted,* No. 19-CV-2820 (NEB/TNL), 2021 WL 3418438 (D. Minn. Aug. 5, 2021), *aff'd,* No. 21-3065, 2022 WL 245541 (8th Cir. Jan. 27, 2022).

## C.  Claims for Official-Capacity Damages

In their motion, defendants correctly argue—and it is well established—that plaintiff may not recover damages from any of the defendants in their official capacities.  State employees acting in their official capacities are not "persons" for purposes of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  In addition, the Eleventh Amendment, which immunizes the states against suits for money damages brought in federal court, *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013), applies with equal force to suits brought against state employees in their official capacities, *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996); *see also Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.").  Accordingly, the court will grant the motion to dismiss all claims for damages against all defendants in their official capacities.

## D.  Failure to State A Claim

Defendants also argue that Ford's claims fail both because he has failed to allege adequate personal involvement against any defendant and because none of his allegations state a claim.  The court discusses the claims, rather than separately addressing the extent of each defendant's personal involvement, and it concludes that all of Ford's claims are subject to dismissal.

### 1.  Claims Under HIPAA

Ford asserts that his HIPAA rights were violated when it was revealed to others that he was not vaccinated, but these claims fail.  Most fundamentally, any HIPAA claims fail because the statute does not provide a private cause of action.  *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir.), *cert. denied*, 142 S. Ct. 716 (2021).

### 2.  Claims Under the Virginia Constitution

In many of his claims, Ford alleges violations of Article I of the Virginia Constitution, identifying one or more of the following sections in each claim: Sections 1, 2, 3, 7, 8, 9, 11, 12, 16, and 17.  (*See generally* Compl. 83–99.)  Ford does not discuss any of these sections individually, nor does he explain which facts he offers in support of what claims or how any of the facts show a violation of any individual section.

While pro se complaints are subject to a liberal construction, the court is not required to construct claims that are not "fairly presented."  *Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring) (noting the court does not act as an inmate's advocate, is not expected to construct full blown claims from sentence fragments, and does not conjure up questions never squarely presented); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that a district court is not expected to assume the role of advocate for a *pro se* plaintiff).

Consistent with this authority, the court will not sort through more than one hundred pages of allegations to guess at how Ford believes defendants violated a particular section of Virginia's state constitution.  *See also Walker v. Prince George's Cnty.*, 575 F.3d 426, 429 n.* (4th Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in [a party's filings].").

Furthermore, at least some—if not all—of these state constitutional claims are barred for various reasons.  First, any claims based on Article I, Section 8 fail because that provision applies only to criminal prosecutions.  Va. Const., Art. I § 8.

Many of his other claims fail because they are based on sections that are not self-executing.  As explained in *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712 (E.D. Va. 2015), "[i]n order to enforce a private right of action under the Virginia Constitution, the provision in question must be self-executing."  *Id.* at 728.  In *Doe*, the court

concluded that Section 11 of Article 1 was "self-executing," but only with regard to deprivations of property. *Id.* (collecting cases); *see also Calloway v. Commonwealth of Virginia*, No. 5:16-CV-00081, 2017 WL 4171393, at *4 (W.D. Va. Sept. 20, 2017) (holding same). Because Ford's due process claims do not involve the taking of property, Ford may not bring a claim under Section 11 of Article I.

Similarly, another judge of this court has held that Section 12 (concerning freedom of speech) is only self-executing for challenges against laws or ordinances that purportedly infringe on free speech rights, but not other types of free speech claims. *Mais v. Albemarle Cnty. School Bd.*, __ F. Supp. 3d __, 2023 WL 2143471, at *5–6 (W.D. Va. Feb. 21, 2023) (discussing the issue at length). Under that reasoning, Ford has no viable claim under Section 12, either, as his claims are not based on a law or ordinance, but on procedures and policies of a state agency. *See id.*

Defendants summarily state that the other sections relied upon by Ford are not self-executing, but are "instead, broad statements of policy and do not include any enforcement mechanism." (Defs.' Mem. Support Mot. Dismiss 17.) Ford does not respond in substance to that argument. Based on its own research, the court concludes that the issue is less clear than defendants suggest. *Cf. Mais*, 2023 WL 2143471, at *5 ("[C]onstitutional provisions are 'usually' considered self-executing if they appear in the Bill of Rights or are provisions of negative character."); *Jones v. City of Danville*, No. 4:20-CV-00020, 2021 WL 3713063, at *11 (W.D. Va. Aug. 20, 2021) (stating that Article I of the Virginia Constitution "is the Commonwealth's entire Bill of Rights").

But other courts have held that at least some of the other sections on which Ford relies are not self-executing. *E.g.*, *Quigley v. McCabe*, No. No. 2:17CV70, 2017 WL 3821806, at *6 (E.D. Va. Aug. 30, 2017) (Section 9); *Capel v. Chesapeake Sheriff's Off.*, No. 2:20CV129, 2022

14

WL 571528, at *5 (E.D. Va. Feb. 18, 2022), *aff'd,* No. 22-1178, 2022 WL 11752020 (4th Cir. Oct. 20, 2022) (Sections 8-A and 9); *Chandler v. Routin*, No. CL02-1080, 2003 WL 23571249, at *2 (Va. Cir. Ct. Sept. 23, 2003) (Sections 1, 8, and 10).  Thus, at least some of Ford's claims fail on this basis.

Furthermore, at least some of the federal and state constitutional claims "rise and fall together," including Article I, Section 12's freedom-of-speech guarantee and any due process claims under Section 11.  *Vlaming v. West Point School Bd.*, 480 F. Supp. 3d 711, 721 (E.D. Va. 2020) (free speech and due process); *Delk v. Moran*, *Delk v. Moran*, No. 7:16CV00554, 2019 WL 1370880, at *5 (W.D. Va. Mar. 26, 2019) (free speech).  Accordingly, "courts may look to federal constitutional law when deciding Virginia constitutional claims."  *Vlaming*, 480 F. Supp. 3d at 721.  Thus, for the same reasons that Ford's federal constitutional claims fail, and to the extent the state claims are co-extensive, his state constitutional claims also fail.

Lastly, even if some of his Virginia constitutional claims survived a motion to dismiss, the court would decline to exercise jurisdiction over them.  *See* 28 U.S.C. § 1367(c)(3).  For all of the foregoing reasons, the court will dismiss Ford's claims based on the Virginia Constitution.

### 3.  Claims Under the Fifth, Ninth, and Tenth Amendments of the U.S. Constitution

Ford's claims include alleged violations of many amendments to the U.S. Constitution, including the Fifth Amendment, but the Fifth Amendment's Due Process Clause applies only to actions of the federal government—not state or local governments or officials.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also Starbuck v. Williamsburg James City Cnty. School Board*, 28 F.4th 529, 537 (4th Cir. 2022).  None of the defendants are federal officials and the Fifth Amendment in inapplicable here.  Thus, all of Ford's claims based on the Fifth Amendment must be dismissed.

Ford's claims brought pursuant to the Ninth and Tenth Amendments also fail as a matter

of law.  "The Ninth Amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim."  *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986).  *See also  Wohlford v. U.S. Dep't of Agriculture*, 842 F.2d 1293, 1988 WL 24281, at *1 (4th Cir. 1988) (unpublished table decision) (citing *Strandberg*); *Evans v. Pitt Cnty. Dep't of Soc. Serv.*, 972 F. Supp. 2d 778, 797 (E.D.N.C. 2013), *vacated in part on other grounds by Evans v. Perry*, 578 F. App'x 229 (4th Cir. 2014).  Likewise, the Tenth Amendment "creates no constitutional rights cognizable in a civil rights cause of action." *Strandberg*, 791 F.2d at 744.  For these reasons, Ford's Ninth and Tenth Amendment claims also will be dismissed.

### 4.  Claims Under the Ku Klux Klan Act of 1871

Ford's complaint asserts claims under the Ku Klux Klan Act of 1871, a statute which subsequently led to 42 U.S.C. §§ 1985, 1986.  *Cf. Andreadakis v. Ctr. for Disease Control & Prevention*, No. 3:22CV52 (DJN), 2022 WL 2674194, at *7 (E.D. Va. July 11, 2022), *appeal docketed*, No. 22-1953 (4th Cir. Sept. 12, 2022) (discussing history of Act and noting that it has been embodied in 42 U.S.C. §§ 1985 and 1986).

Based on its review of Ford's complaint, the court concludes that he has not pled adequate facts to allege a violation of the Ku Klux Klan Act of 1871.  Ford's complaint asserts only a tenuous and unsupported allegation between race and religion, but this is insufficient to state a claim under this Act.  *Cf. id.*  Moreover, to state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege that the conspirators harbored "some racial, or otherwise class-based, invidiously discriminatory animus."  *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  A person's vaccination status, which is based on his choice as to whether to accept a vaccine, however "coerced," is not a "discrete, insular, and immutable characteristic[] comparable to

those characterizing classes such as race, national origin, and sex." *Andreadakis*, 2022 WL 2674194, at *8 (quoting *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985)).

Ford's complaint contains conclusory allegations of racial discrimination, but they are unsupported by factual matter. For example, in discussing his grievances, he states that the "new normal" policies are "racist" and "clearly marginalize [and] discriminate against . . . African-Americans," like him, although he does not explain how. (Compl. 64.) He also states that the "new normal" violates "Juneteenth Principles" because it keeps him in a state of "civil death" or "slavery." (*Id.* at 65.)

Again, though, nowhere does he explain—with any actual factual content—how the "new normal" policies discriminate against any racial group. He also asserts that defendant Hartsook is restricting "three African-American workers" from working in the law library, but allowing Caucasian inmates to work there. (*Id.* at 65–66.) But he does not allege which, if any, of the other workers are unvaccinated. Moreover, he acknowledges that the reason he was not permitted to work in the library was because he was not vaccinated, not because of his race. Thus, he has failed to allege facts showing defendants conspired to violate the Ku Klux Klan Act of 1871. These claims will be dismissed.

**5. Claims Under the Americans with Disabilities Act and the Rehabilitation Act**

Defendants contend that Ford's claims fail to state a claim under the ADA because he does not have a disability, as that term is defined in the ADA. Although defendants do not address it, Ford also asserts a claim under Section 504 of the Rehabilitation Act.

Although there are some differences between the standards under the two acts (most notably the causation standard, *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005)), they "share the same definitions of disability." *Rogers v. Dep't of Health & Env't Control*, 174 F.3d 431, 433 (4th Cir. 1999); *see also Bragdon v. Abbott*,

524 U.S. 624, 646 (1998) (noting same).  As discussed next, the court concludes that Ford has

failed to allege facts to show he has a disability under either statute.

The Fourth Circuit has explained:

> Title II of the ADA provides that no qualified individual shall, "by
> reason of [a] disability," be denied the benefits of public "services,
> programs, or activities" or be subject to discrimination by a public
> entity. 42 U.S.C. § 12132. The term "disability" is defined by the
> Act to mean "a physical or mental impairment that substantially
> limits one or more major life activities," "a record of such an
> impairment," or "being regarded as having such an impairment." *Id.*
> § 12102(1) . . . . [T]o state a cause of action under Title II, an
> individual must plausibly allege (1) that he has a disability or has
> been regarded as having a disability; (2) that he is otherwise
> qualified to receive the benefits provided by a public entity; and (3)
> that he was denied those benefits or was otherwise discriminated
> against on the basis of his disability. *See Wicomico Nursing Home
> v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).

*Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020).

Ford asserts that he has a disability in the form of a "mental impairment," offering the

following explanation:  "Plaintiff's impairment is that he is unable to suppress his good sense to

take a BWMD that will likely kill him and others.  Nor would plaintiff be able to drink Jim

Jones' cyanide simply because Jim Jones said it was Kool-Aid. And because of such way of

thinking, Plaintiff was prohibited in every way."  (Pl.'s Resp. 71–72.)  Even if this could

somehow be interpreted as an "impairment," he has not alleged or shown how it "substantially

limits one or more major life activities."  Thus, Ford does not have a qualifying mental or

physical impairment within the meaning of the ADA and Rehabilitation Act.

The court also considers whether Ford's complaint could be construed as alleging that he

was "regarded as" having a disability.  Even so construed, though, his claims still fail.  Another

district court in Virginia addressed a similar claim by a county employee, who alleged that the

county's classification of him as unvaccinated, as well as requiring him to test weekly and wear a

mask in order to retain his employment, violated the ADA.  He alleged that he was being treated as if he had an "impaired immune system" and "impaired respiratory system."  *Id.* at *2.

In dismissing the plaintiff's complaint, the *Schneider* court flatly rejected that he was "regarded as having a disability," so as to state a claim under the ADA.  The court's reasoning is equally applicable here:

> Whether an employee is regarded as disabled is measured from the "reactions and perceptions of the employer's decisionmakers." *Wilson v. Phoenix Specialty Mfg. Co., Inc.*, 513 F.3d 378, 385 (4th Cir. 2008) (quoting *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 172–73 (4th Cir. 1997) *abrogated on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998)). The Amended Complaint contends that the County's policy regarded unvaccinated individuals "'as if' they carried [COVID-19] or 'as if' they had an impaired or suppressed immune system that made them prone to contracting '[COVID-19].'" [Dkt. No. 14] at ¶ 7. This theory of liability has been rejected by multiple courts in this circuit and around the country. For example, in *Tony Jorgenson v. Conduent Transport Solutions, Inc.*, 2023 WL 1472022, at *4 (D. Md. Feb. 2, 2023), a case involving nearly identical facts and arguments raised by Schneider, the court concluded that it was implausible that the employer regarded all unvaccinated employees as having COVID-19. In addition, a judge in this district has held that, to the extent requiring unvaccinated employees to test weekly suggests a belief that they are more prone to contracting COVID-19, "possible future exposure to COVID-19 does not constitute an impairment under the ADA." *Hice v. Mazzella Lifting Techs., Inc.*, 589 F. Supp. 3d 539, 550 (E.D. Va. 2022).
>
> The Amended Complaint contains no plausible factual allegations to suggest that the defendant regarded Schneider as having a physical or mental impairment. Instead, the alleged facts show that plaintiff was subject to a generally applicable policy which required him, as well as all other County employees, to disclose their vaccination status and to provide evidence of weekly testing if unvaccinated, all of which plaintiff refused to do. Plaintiff's refusal to follow his employer's requirement to report his vaccination status which led the County to treat him as unvaccinated "is not the same as believing [he] has a physical or mental impairment." *Jorgenson*, 2023 WL 1472022, at *4. *See Speaks v. Health Sys. Mgmt., Inc.*, 2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022) ("Again, there is no plausible basis to conclude that Health Systems regarded Speaks as having a 'physical or mental impairment.' The Company

> only regarded Speaks as being required—like all of its employees—
> to obtain a COVID-19 vaccine or be approved for an exemption and
> then 'regarded' her as having failed to do so by the deadline to
> become vaccinated."). For these reasons, the Amended Complaint
> fails to allege a plausible claim that the County regarded plaintiff as
> disabled.

*Schneider v. Cnty. of Fairfax*, No. 122CV871LMBWEF, 2023 WL 2333305, at *4–5 (E.D. Va.

Mar. 2, 2023), *appeal docketed*, No. 23-1303 (4th Cir. Mar. 21, 2023) (internal footnote

collecting authority omitted).

Although *Schneider* arose in the employment context, the court concludes that the same

reasoning applies here, because the definition of "disability" under the statutes does not change

with the context.  In short, Ford has not plausibly alleged either that he had a disability or that

defendants "regarded him" as having a disability.  He therefore has not alleged sufficient facts to

state a claim under either the ADA or the Rehabilitation Act.  Any such claims must be

dismissed.

### 6.  Claims Under RLUIPA

Under RLUIPA, a plaintiff may not recover damages against defendants in either their

official or individual capacities.  *Sossamon v. Texas*, 563 U.S. 277, 288 (2011) (holding damages

are unavailable for official-capacity claims); *Rendelman v. Rouse*, 569 F.3d 182, 184 (4th Cir.

2009) (holding individual-capacity damages are unavailable under RLUIPA when invoked as a

spending clause statute); *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 113 (4th Cir. 2023)

(explaining that under RLUIPA, the prisoner-plaintiff could obtain only equitable relief, not

damages).

Plaintiff concedes in his response that, two days after he filed this action, defendants

changed their policy and stated that "they would no longer restrict participation to religious

programs, law library, vocations, recreation, and library to only "vaccinated" prisoners."  (Pl.'s

Resp. 77–78.)[12]  Although he contends that this change in policy was a "clear admission of guilt," it also has the practical effect of rendering moot his RLUIPA claims, because they can provide only injunctive relief and not damages.  *See Firewalker-Fields*, 58 F.4th at 113–14 (explaining that prisoner's transfer from the facility implementing the challenged policy mooted his RLUIPA claims).  Thus, Ford's RLUIPA claims will be dismissed.

### 7.  First Amendment Claims Based on Religion

A First Amendment free-exercise claim requires a showing that the defendant imposed a substantial burden on the plaintiff's religious exercise.  *Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019) (setting forth the elements of a claim alleging a violation of the Free Exercise Clause in this context, which requires plaintiff to demonstrate that he holds a "sincere religious belief" and that "a prison practice or policy places a substantial burden on his ability to practice his religion").  The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion.  *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).  Moreover, a prisoner must show a "conscious or intentional interference" with his rights; mere negligence is insufficient.  *Lovelace v. Lee*, 472 F.3d 174, 194–95, 201–02 (4th Cir. 2006).

In addressing the First Amendment claims of prisoners, a policy or regulation is valid so long as it is "reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1997).  This standard "affords less protection to inmates' free exercise rights than does RLUIPA."  *Lovelace*, 472 F.3d at 199–200.  In deciding whether there is a reasonable relation between the policy and asserted interest served by it, courts should examine:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the

---

[12] Defendants continued to ban visitation for some time for unvaccinated prisoners, which prevented plaintiff from visiting with his mother before her July 2022 death and prevented him from comforting any friends or family or being comforted by them after she had died.  (Pl.'s Resp. 78.)  Ford does not allege that this interferes with or substantially burdened his religion, so it does not give rise to a RLUIPA claim based on religion.

policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014); *Turner*, 482 U.S. at 89–92.

In weighing these factors, the court must "respect the determinations of prison officials." *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). Further, the court also must avoid "the micromanagement of prisons," *id.* at 99, and instead "accord substantial deference to the professional judgment of prison administrators." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). A plaintiff has the burden of proof under the *Turner* analysis to disprove the validity of the prison regulation at issue. *Id.* Because plaintiff bears that burden, moreover, he also must allege facts in his complaint sufficient to show that the policy at issue lacked a "rational relation to legitimate penological interests." *Desper v. Clarke*, 1 F.4th 236, 244 (4th Cir. 2021); *see also Firewalker-Fields*, 58 F.4th at 115 (noting that it is the prisoner's burden to show that the practice or regulation does not satisfy *Turner*).

Ford's complaint fails to satisfy his burden as to any First Amendment claim. First of all, he does not provide sufficient factual matter to establish that any defendant "imposed a substantial burden" on his religious exercise. Other than stating that he has been unable to gather with his religious community, he does not explain in his complaint how this inability violated his religion or significantly burdened it.

But even if his allegations were sufficient to show a substantial burden, his claim still fails because he cannot show that the policy here does not satisfy *Turner*. Defendants stated that they were implementing the "new normal" to encourage vaccination, as part of their attempt to control or limit the spread of COVID-19, and the facts alleged by Ford support that as the reason

for the limitations.  That is certainly a valid penological interest.  Indeed, as defendants note, they have an obligation to try to limit the spread of dangerous diseases within VDOC facilities.

Further, limiting unvaccinated persons from attending religious services and other public gatherings is "reasonably related" to that interest, and Ford has not alleged facts within his personal knowledge to the contrary.  He believes that he has adequate natural immunity and should not be compelled to take what he deems a dangerous vaccine.  Assuming he has adequate natural immunity, perhaps the precise terms of the "new normal" policies are an imperfect fit with the stated goal.  But a perfect fit is not required under the First Amendment, only a reasonable relation.  And encouraging vaccination and limiting participation for programs for those who refuse to be vaccinated are reasonably related to the stated interest.  Accordingly, Ford has failed to allege a violation of his First Amendment religious rights.[13]

### 8.  Claims Asserting Retaliation Based on Exercise of First Amendment Rights

In Claim 15, Ford asserts a retaliation claim, which defendants do not expressly address in their motion to dismiss.  But upon careful review of his complaint, the court notes that he references retaliation multiple times.

To succeed on any retaliation claim, Ford must establish that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct."  *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)) (alterations omitted).  Notably, however, the Fourth

---

[13]  Defendants address a possible establishment clause claim that appears based on Ford's attempts to equate separating the vaccinated from the unvaccinated with a division along racial lines, which is then somehow tied into religion.  (Defs.' Mem. Supp. Mot. Dismiss 14–15.)  Just as defendants appear confused about this theory of recovery and its lack of logic (*id.*), so is the court.  Again, liberal construction of a *pro se* complaint does not include creating causes of action on the plaintiff's behalf.  *Brock*, 107 F.3d at 243 (Luttig, J., concurring). To the extent there is an establishment clause claim in these allegations, it is entirely unclear to the court what plaintiff is asserting.

Circuit has cautioned that courts must treat an inmate's claim of retaliation by prison officials "with skepticism." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996). Thus, conclusory allegations of retaliation are insufficient to survive dismissal. *Adams v. Rice*, 40 F.3d 72, 74–75 (4th Cir. 1994) (summarily dismissing retaliation claim as insufficient because it consisted merely of conclusory allegations and no facts to show retaliatory motivation).

Most of Ford's retaliation claims are based on many of the same facts as his other claims, and he sometimes refers to an action or policy as "retaliation" for his refusal to be vaccinated. For example, he describes it as retaliation that Hartsook engaged in libel, slander, and defamation when she "told staff and other prisoners that [Ford] posed a serious infectious health risk, which also violated his HIPAA rights." (Compl. 72–73.) Similarly, he claims that he was retaliated against by the denial of his grievances and by not allowing him to attend religious services, denying him visitation, etc. because he is not vaccinated. (*Id.* at 81–83.) Thus, nearly all of the alleged retaliation falls in the category of being the result of the "new normal" policies, which were actions taken against him not because he filed complaints, but because he elected to remain unvaccinated.

As to this type of claimed "retaliation," then, it is more properly described as the implementation of the policies restricting unvaccinated prisoners. The complaint in this case and the timing of his alleged complaints and grievances about vaccination and the "new normal" make clear that those restrictions were announced *before* he started complaining about being compelled or coerced to receive the vaccine. That is, the limitations that would be in effect under the "new normal" preceded and prompted his many complaints. Thus, those decisions pre-date his "protected activity" and cannot support a retaliation claim. Put differently, what he is calling retaliation was not related to his engaging in protected activity such as filing grievances; they were the natural result under the stated policies of his refusal to be vaccinated.

24

In terms of "additional retaliation," Ford also alleges two retaliatory actions that appear unrelated to his vaccination status.  (*Id.* at 80–83.)  First, he alleges that three times in October 2021, he was called to the law library, but then told to leave after about 45 minutes and the law library was shut down.  On one of the occasions, he was told the server was down.  This resulted in him not being able to do any tasks or research on those occasions.  (Compl. 80–81.)

Second, he alleges that someone changed his class level (which determines the rate at which he earns good-time credit) from a 1 to a 2 and changed his release date.  He states that he is properly a Class 1.  (*Id.* at 81. )

Prisoners have a "First Amendment right to be free from retaliation for filing a grievance."  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017).  Thus, for decisions and actions that were made or occurred *after* he began complaining—which are the two types of retaliation described above—the court must consider whether the adverse action against him is one that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

As to his claim that three times in one month, he was called to the law library to research but then sent away, the court concludes that this is not a sufficiently adverse action to support a retaliation claim.  He states that because of his fear of "further retribution," he has—"for the most part"—stopped filing complaints and grievances.  (*Id.* at 82.)  But the test is not a subjective one.  Instead, to determine whether an action is sufficient to chill First Amendment expression, the court must ask whether an objective person of "ordinary firmness" would be chilled in his speech by defendant's conduct.  *Constantine*, 411 F.3d at 500.

As to the law library incidents, courts have held that similar minor inconveniences and minor property losses are generally insufficient to support a retaliation claim.  *Burgos v. Canino*,

358 F. App'x 302, 307 (3d Cir. 2009) (explaining that "temporary inconveniences" do not rise to the level of an adverse action). *See also, e.g.*, *Zaire v. Coryer*, 204 F. App'x 948, 949 (2d Cir. 2006) (holding that confiscation of plaintiff's towel was *de minimis*, and not a sufficiently adverse action to support a retaliation claim); *Ballance v. Angelone*, 7:01CV00410, 2002 WL 32074716, at *2 (W.D. Va. May 2, 2002), *aff'd*, 46 F. App'x 223 (4th Cir. 2002) (same as to confiscation of 800 photographs and a pair of headphones); *Miller v. Coning*, No. CV 11-377-LPS-SRF, 2014 WL 808023, at *12–13 (D. Del. Feb. 28, 2014), *report and recommendation adopted,* No. 11-0377-LPS, 2014 WL 3896605 (D. Del. Aug. 7, 2014) (same as to all of the following: (1) defendant's filing of an incident report without any related disciplinary action; (2) multiple cell shakedowns; (3) verbal threats, staring at plaintiff with "grit," and "deliberately shouldering him").  Like the actions in these other cases, Ford's being called to the law library on three occasions and then being sent back and not being permitted to research do not rise to the level of an adverse action sufficient to support a retaliation claim.  This claim also fails because Ford does not allege who sent him away from the library, as required to state a valid claim against any particular defendant.

Turning next to the change in Ford's class level and release date, it is a jury issue as to whether this would satisfy the "adverse action" requirement.  Even so, this retaliation claim fails because the facts in his complaint do not plausibly state a claim against any defendant.  First, it is not even clear from the complaint who took this action.  Ford first alleges that defendant Walker was responsible for changes to his "class level."   He later alleges that he was told that Hartsook made the change for an "unknown reason," although he sets forth no facts based on personal knowledge to show that is true.  (*Id.* at 82.)  For a particular defendant to be held liable for retaliation,  he or she must have taken an adverse action against him, and his current allegations do not make clear who reclassified him, when, or for what stated reasons.

Further—and independently dispositive of his claim—Ford has not presented any *facts* to show that the action was in retaliation for his filing of complaints or grievances, as required to establish the third element of a retaliation claim.  He does not identify any statements by any defendants to that effect, he has not set forth dates sufficient to show any temporal connection, and he has not pled any other facts to suggest that any defendant's motive was retaliation.  His own belief that the action was retaliatory is a mere conclusory allegation of retaliation and is insufficient to survive dismissal.  *Adams*, 40 F.3d at 74–75 (summarily dismissing retaliation claim as insufficient because it consisted merely of conclusory allegations and no facts to show retaliatory motivation).

For all of these reasons, the court will dismiss his retaliation claims.  Because he may be able to state a claim, with additional factual matter, based on the change to his class level and release date, the court will dismiss that claim without prejudice.

### 9.  Eighth Amendment Conditions-of-Confinement Claims

Ford's Eighth Amendment claims also fail.  The court construes these claims as alleging that defendants were deliberately indifferent to dangerous conditions that existed at CWCC, in violation of his Eighth Amendment rights, *i.e.*, as conditions-of-confinement claims.  It is not clear to the court precisely what his Eighth Amendment claims are based upon, but the court sees three possible bases.

First, Ford appears to allege that defendants did not do—or are not doing—enough to prevent the spread of COVID, which led to him contracting the infection.  In conjunction with this, the court will consider his allegations that a counselor came to his dorm in December 2021 and shook hands with people.  Within a week of that incident, there was a COVID outbreak in the dorm, which he attributes to that counselor's actions.

Second, he alleges that the policies associated with the "new normal," which led to his deprivation of access to the law library, work, and visitation, constituted cruel and unusual punishment.

Third, he alleges that the conditions after implementation of the new normal—which involved refusing to turn on the ventilation system, limiting outdoor time to about one hour per day, and requiring masking—violate his Eighth Amendment rights.  As to the third, he also contends that the outdoor air is crucial because CWCC prisoners live in a "cramped dorm with 80 people (plus staff) in the room, with bunk beds" and limited space between bunks.  (Compl. 83.)  He also complains that defendants "continue to press masking policies," which he asserts cause "harm and no good" and do not "prevent infection."  (*Id.* at 85–86.)

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  To adequately allege a conditions-of-confinement claim, a prisoner must set forth facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted).  The objective prong requires the prisoner to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions" or "demonstrate a substantial risk of such serious harm."  *See Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).  To satisfy the second prong, a plaintiff must allege that a defendant was actually aware of a serious risk of significant harm to the prisoner and disregarded it.  *Shakka*, 71 F.3d at 166.  Deliberate indifference is an "exacting standard."  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Ford's claims do not satisfy this high standard.  Based on Ford's own allegations, most of

the conditions about which he complains—including disallowing movement of prisoners like him who had not been vaccinated, and limits on use of ventilation and outside recreation paired with masking—were implemented to prevent the spread of COVID-19 through the prison population.  His allegations, accepted as true, show that defendants were aware of a risk of substantial harm from COVID-19, and took steps to reduce that harm.  They did not ignore it.

### a.  Conditions that led to Ford contracting COVID-19

Ford points to a number of things that he alleges may have contributed to his contracting COVID-19, including mingling of prisoners and staff, and the provision of flu shots to other inmates, and later (in the period "after" the new normal), a counselor shaking hands with numerous prisoners in his dorm, leading to a COVID outbreak, although he did not test positive as a result.

As this court has addressed in other cases brought by VDOC prisoners (and others) during the pandemic, the potential spread of COVID-19 satisfies the objective element of an Eighth Amendment claim.  *Zellers v. Northam*, No. 7:21-CV-393, 2022 WL 3711892, at *7 (W.D. Va. Aug. 29, 2022);  *Ross v. Russell*, No. No. 7:20-CV-000774, 2022 WL 767093, at *10 (W.D. Va. Mar. 14, 2022).

As this court explained in both *Ross* and *Zellers*, though, the extensive policies VDOC and other jail facilities implemented to combat COVID-19 constitute substantial evidence that prison officials (and here, the governors) were *not* deliberately indifferent, even when those policies were sometimes not followed or enforced.  *Ross*, 2022 WL 767093, at *11–13 (collecting authority and dismissing Eighth Amendment claim); *Zellers v. Northam*, No. 7:21-CV-393, 2022 WL 3711892, at *9–11 (W.D. Va. Aug. 29, 2022) (same and dismissing claims against Northam, Clarke, and the warden at plaintiff's facility where plaintiff alleged that the

measures taken to combat COVID-19 were insufficient and that they could have implemented better policies).

The court adopts and incorporates its reasoning in those cases here.  Based on that reasoning, Ford's claim that any defendants were deliberately indifferent to the risk of COVID-19 posed to him and other CWCC inmates fails.  Additionally, for the reasons explained in those cases, even occasional lapses in the policies (such as the counselor shaking hands with many people in the dorm, assuming that was not permitted in December 2021), does not constitute deliberate indifference absent additional allegations.  *See Ross*, 2022 WL 767093, at *13–14; *Zellers*, 2022 WL 3711892, at *10.

Further, as set forth in both of those cases, the individuals named are entitled to qualified immunity as to any individual-capacity claims for damages.  *See Ross*, 2022 WL 767093, at *14–15; *Zellers*, 2022 WL 3711892, at *11.

### b.  Policies encouraging vaccination and "new normal" policies and procedures

As to any Eighth Amendment challenges to the "new normal" policies, the court notes first that nothing in Ford's complaint supports his assertion that he is being compelled or mandated to receive a COVID vaccine.  There may be incentives to receive one, in terms of an ability to attend programs or obtain prison employment, but no one is requiring him to get a vaccine.  Put differently, he is not being forcibly medicated—he has not received the vaccine and is not being required to.  Thus, he is not subject to a substantial risk of serious harm from the vaccines by any act of defendants.

Moreover, although he clearly disagrees with VDOC's policy, disputes the effectiveness of COVID vaccines, and presents his "research" on that issue, contrary opinions certainly exist.  Indeed, government agencies have recommended vaccines for COVID-19 and continue to do so.  *See* "Vaccines for COVID-19," available at https://www.cdc.gov/coronavirus/2019-

ncov/vaccines/index.html (last visited March 24, 2023) ("COVID-19 vaccines are safe, effective, and free."); Virginia Department of Health, "Vaccination FAQ," available at https://www.vdh.virginia.gov/covid-19-faq/vaccination/ (last visited March 24, 2023).

Put differently, where defendants attempt to mitigate a risk, even if their attempts are ill-advised, unsuccessful, or negligently performed, they are not being deliberately indifferent toward that risk. Indeed, it is obvious from plaintiff's allegations that VDOC officials disagreed with plaintiff's opinions about the dangers of the vaccine. As such, they could not have subjectively believed that encouraging inmates to obtain the vaccine was likely to cause harm, so as to show deliberate indifference. In short, defendants' efforts to vaccinate the inmate population through policies designed to encourage inmates to receive them, does not meet the high standard for deliberate indifference, despite Ford's beliefs about the dangers of COVID-19 vaccines.

c.  **"Conditions" related to ventilation and time outside**

As for the conditions about which Ford complains as still occurring as of the filing of his complaint, the court concludes that he has not shown that they satisfy the objective component of an Eighth Amendment claim. As he describes it, the ventilation system is off because CWCC officials do not want COVID-19 to spread throughout the facility through the ventilation. It is unclear what the reasons are for the limited outside recreation.

Regardless of the reasons for these policies,  neither a lack of ventilation, without more, nor a limitation to one outside hour of recreation per day to inmates living in a dorm-style housing unit, caused denial of "the minimal civilized measure of life's necessities." *See Farmer*, 511 U.S. at 834. Other cases have concluded that similar—and far worse—conditions do not satisfy the objective component of an Eighth Amendment claim. *See, e.g.*, *Beverati v. Smith,* 120 F.3d 500, 504 (4th Cir. 1997) (finding that segregation inmates did not

31

state Eighth Amendment claim when they complained of being housed for six months in a unit with no outside recreation, no clean clothes, inadequate food, and cells infested with vermin and smeared with urine and feces); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (holding 45 minutes of outdoor exercise per week did not state an Eighth Amendment claim); *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (same as to one hour of exercise per week outdoors).

Furthermore, although Ford's complaint contains conclusory statements of unspecified "trauma" from the entirety of what has occurred to him since the "new normal" was implemented, (Compl. 86), the harms he alleges as a result of either a lack of ventilation or a lack of adequate outside recreation time and outside "air" do not appear to be harms that occurred *to him*, but general harms that *could* occur.  (*Id.* at 85 (explaining they have led to an increase in COVID circulation, constantly breathing contaminated air, other sicknesses, weight gain, increase in blood pressure and stress, as well as mold").  But he does not say that he experienced any of these symptoms.  He thus also fails to plausibly allege the harm or "grave risk of harm" sufficient to allege plausibly the second element of his Eighth Amendment claim.

For all of the foregoing reasons, Ford's complaint fails to state an Eighth Amendment claim.

### 10. Fourteenth Amendment Claims

The court construes Ford's complaint as also alleging violations of both the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

#### a.  Due Process Clause

The alleged violations of the Due Process Clause are based on several different acts by defendants or others.  First of all, Ford's claim challenging his conviction and sentence as obtained in violation of due process (Claim 6) is not properly brought in an action pursuant to 42

U.S.C. § 1983.  Such claims by state prisoners must be brought instead as a petition for writ of habeas corpus, after first exhausting state-court remedies.  Thus, Claim 6 is dismissed because it is not properly asserted here.

Other claims in which he appears to allege due process violations are Claims 1, 3, 4, 5, 10, and 13 (based on the incentives to vaccinate, including the limitations on the movement of unvaccinated prisoners and their ability to attend programs) and Claim 7 (based on the denial or improper handling of his grievances).  None of these claims entitle him to relief.

"To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law."  *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).

First, as to Ford's claim (in Claim 7) that his due process rights were denied based on defendants' responses to his grievances, interference with his grievance rights, or violation of the grievance procedures, such allegations do not state a constitutional claim.  This is so because "inmates have no constitutional entitlement or due process interest in access to a grievance procedure."  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017); *see also Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("The Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state.").  Thus, the Fourteenth Amendment claim in Claim 7 must be dismissed.

Similarly, to the extent Ford is complaining that he has been denied prison employment, he has not identified a constitutionally protected liberty or property interest, because prisoners have no liberty or property interest in employment while in prison.  *Fletcher v. LeFevers*, No. 7:21CV00231, 2021 WL 2953678, at *2 (W.D. Va. July 14, 2021); *see also Robles v. Sturdinvant*, No. 7:14-cv-00070, 2014 WL 4853409, at *1 (W.D. Va. Mar. 27, 2014) ("[I]nmates have no independent constitutional right to a prison job and as such, prison officials may

generally terminate an inmate from a particular prison job for any reason without offending federal due process principles.");

His other due process claims (which allege that he was deprived of or restricted from certain privileges, such as visitation privileges, researching at the law library, and participating in certain VDOC programming) likewise fail to identify a protected liberty interest. As the Supreme Court explained in *Sandin v. Conner*, 515 U.S. 472, 485 (1995), mere limitations on privileges, property, and activities resulting from administrative segregation "fall[] within the expected perimeters of the sentence imposed by a court of law" and do not implicate a liberty interest. *See also Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) ("[C]hanges in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement . . . , and the denial of privileges" do not trigger constitutional due process protections.); *Dunford v. McPeak*, No. CIVA 7:08CV00018, 2008 WL 204481, at *2 (W.D. Va. Jan. 24, 2008) (concluding loss of visitation privileges did not trigger due process protections and collecting authority). Thus, the "new normal" policies did not trigger Ford's due process rights.

### b. Equal Protection Clause

To the extent that any of his 14th Amendment claims are more appropriately construed as Equal Protection claims, those claims likewise fail.[14] To prove an equal protection claim, a litigant "must first demonstrate that he has been treated differently from others with whom he is similarly situated." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Morrison v.*

---

[14] Ford's complaint makes a passing reference to an allegation that unvaccinated laundry workers were permitted to work, but he was not permitted to work in the library because he did not receive the vaccine, which he calls discriminatory. (Compl. 68.) This does not appear in the section where he describes his claims, however, and the court does not treat it as a separate Equal Protection claim. In any event, Ford does not provide sufficient facts to state a claim on this issue. He does not provide further detail, nor does he explain who made the decision, so as to state a claim against any particular defendant. It also is unclear to the court whether he is similarly situated in all relevant respects to those laundry workers, who work in a different setting. For example, he has not set forth any facts about the level of contact library employees have with others relative to laundry workers, or other factual matter to show they are similarly situated in all relevant respects. Thus, even if Ford had intended this to be a claim, his failure to allege sufficient factual matter to state a plausible claim would require its dismissal.

*Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  Two groups of persons are "similarly situated" only if they "are similar in all" relevant respects.  *Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007).  Once such a showing is made, then the court will determine "whether the disparity in treatment can be justified under the requisite level of scrutiny." *Veney*, 293 F.3d at 731 (quoting *Morrison*, 239 F.3d at 654).

Notably, vaccinated and unvaccinated prisoners are not similarly situated.  As another judge of this court recently explained, in dismissing a claim that treating vaccinated and unvaccinated workers differently violated the Equal Protection Clause,

> "[A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose." *Cent. State Univ. v. Am. Ass'n of Univ. Professors, Cent. State Univ. Chapter*, 526 U.S. 124, 127–28 (1999) (citations omitted). Courts within the Fourth Circuit have found that policies treating unvaccinated individuals differently than those vaccinated do not target a suspect class. *Bauer v. Summey*, 568 F. Supp. 3d 573, 597 (D.S.C. 2021) ("Although the Policies treat unvaccinated individuals differently than those vaccinated by only subjecting the former to potential termination, such differential treatment does not target a suspect class."); *McArthur v. Brabrand*, No. 1:21-cv-1435, __ F. Supp. 3d __, 2022 WL 2528263, at *7 (E.D. Va. July 27, 2022) ("[H]eightened review is not justified because the quarantine policy . . . is a vaccination-based classification.") (citing cases holding that unvaccinated people do not constitute a suspect class).

*Antunes v. Rector & Visitors of Univ. of Va.*, No. 3:21-CV-00042, 2022 WL 4213031, at *6 (W.D. Va. Sept. 12, 2022).

The *Antunes* court upheld the policy at issue there, which terminated employees who refused to be vaccinated but allowed vaccinated individuals to remain employed.  It reasoned that the policy bore "a rational relationship to some legitimate end," because it was "related to

35

the government interest in preventing COVID-19 from spreading amongst" its employees—who were healthcare workers—and patients.  *Id.*  The same is true here.

Lastly, to the extent Ford is asserting an Equal Protection claim based on his race, he alleges no *facts* to support any assertion that the "new normal" policies were racially discriminatory, as discussed in addressing his claims under the Ku Klux Klan Act of 1871. For the foregoing reasons, all of Ford's Fourteenth Amendment claims must be dismissed.

### 11. Sixth Amendment Claims and Access-to-Courts Claims

In several of his claims, Ford references the Sixth Amendment, including when discussing limitations on his access to the law library.  In general, the Sixth Amendment—which ensures certain rights to criminal defendants, including a right to counsel—is not even applicable to most of Ford's allegations.  Instead, Ford references, in general terms, his desire to seek a pardon from the governor and some type of habeas corpus proceedings, but cites to nothing to show there is a wholesale right to counsel to pursue either.  Thus, it appears that most of his Sixth Amendment claim fails on that basis alone.  *See Duffin v. Reynolds*, No. CA 1:11-1145-TMC-SVH, 2011 WL 5869614, at *1 & n.2 (D.S.C. Oct. 25, 2011) (rejecting access to the courts claim based on the Sixth Amendment where plaintiff sought to prosecute a civil case and noting that that "[b]y its express terms, the Sixth Amendment's right to counsel applies only to criminal proceedings"), *report and recommendation adopted*, No. CA 1:11-1145-TMC, 2011 WL 5869779 (D.S.C. Nov. 22, 2011).

But the Sixth Amendment has been recognized as a source of an access-to-courts claim derived from the right to counsel, as has the First Amendment, as part of the right to petition for grievances.  *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"); *Kane v. Espitia*, 546 U.S. 9, 10 (2005) (noting that access to a prison law

library may derive from the Sixth Amendment right to counsel).

Ford has not identified any criminal proceeding in which he had a right to counsel and that right was somehow infringed so as to state a Sixth Amendment claim. Nonetheless, because the standard for analyzing the claim is the same under either amendment, the court considers his access-to-courts claim under both the First Amendment and Sixth Amendment. All other Sixth Amendment claims will be dismissed.

A plaintiff's right of access to the court "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Thus, in order to state a constitutional claim of denial of access to the courts, a plaintiff must allege facts showing that the challenged action has actually "hindered his efforts to pursue" a nonfrivolous legal claim. *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

Specifically, the plaintiff must identify in his complaint a "nonfrivolous," "arguable" legal claim, along with the potential remedy that claim sought to recover, that was lost as a result of the defendant's alleged interference with the plaintiff's right of access. *Christopher*, 536 U.S. at 415–16 (quoting *Casey*, 518 U.S. at 353). Put differently, the cause of action in the underlying action, "whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.* at 415. This is because the provision of legal services or legal libraries in prisons are not "ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis*, 518 U.S. at 351

Ford claims that the denial of access to the law library for six months preceding the filing of his complaint caused him to be "unable to research, prepare, or present his habeas corpus petition, his petition for pardon, and this petition until now." (Compl. 82–83.) He also states

that he has "been unable to research and prosecute his legal issues" and has missed unspecified deadlines and opportunities, including seeking a pardon by the outgoing governor. Others received pardons, but he does not believe he would receive one from the current governor.

Although Ford states his seeking of a pardon was delayed, he does not explain any "nonfrivolous" basis on which he was seeking a pardon, nor does he explain why he believed he could receive one from the former governor but not the current governor. Similarly, he alleges that he missed deadlines in habeas corpus proceedings, but he does not identify whether those were state or federal habeas proceedings, what "nonfrivolous," "arguable" legal claim he was asserting, or even that any habeas corpus petition was dismissed or denied because it was untimely. Because he has failed to allege any effect on a nonfrivolous claim as a result of his difficulties in accessing the law library, his access-to-courts claims must be dismissed. The court will dismiss them without prejudice, however, because he may be able to add sufficient factual matter to state a claim.

**12. State Law Claims of Negligence, Defamation, Slander, and Libel**

In light of the court's dismissal of plaintiff's federal claims, it will decline to exercise jurisdiction over any state-law claims, such as all of his state-law tort claims. *See* 28 U.S.C. § 1367(c)(3).

### III.  CONCLUSION

For the foregoing reasons, Ford's complaint fails to state a claim against any of the defendants and must be dismissed. Because it is possible that Ford may be able to state a valid retaliation claim about his class level/release date and as to his access-to-courts claim under the First Amendment, the court will allow him to file an amended complaint asserting those claims and restating any state-law tort claims, should he choose to do so.

The remaining motions in the case, including Ford's motion to expand or supplement the record, will be denied as moot.

An appropriate order will be entered.

Entered: March 31, 2023.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge